IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA MADRIGAL, | ) | CASE NO. 3:15 CV 2314 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## Introduction

Before me by referral[1] is an action by Christina Madrigal under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income.[2] The Commissioner has answered[3] and filed the transcript of the administrative record.[4] Under my initial[5] and procedural[6] orders, the

---

[1] This matter was referred to me under Local Rule 72.2 in a non-document entry order dated November 12, 2015.

[2] ECF # 1.

[3] ECF # 14.

[4] ECF # 15.

[5] ECF # 10.

[6] ECF # 16.

parties have briefed their positions[7] and filed supplemental charts[8] and the fact sheet.[9] They

have participated in a telephonic oral argument.[10]

## Facts

### A.    Background facts and decision of the Administrative Law Judge ("ALJ")

Madrigal who was 38 years old at the time of the administrative hearing,[11] did not

graduate from high school and has a ninth grade education.[12]  She is single with three adult

children and lives in an apartment with a friend.[13]  Madrigal has not been employed since

2007[14] and has no past relevant work history.[15]

The Administrative Law Judge ("ALJ"), whose decision became the final decision of

the Commissioner, found that Madrigal had severe impairments consisting of major

depressive disorder; post traumatic stress disorder; borderline intellectual functioning; and

---

[7] ECF # 20 (Commissioner's brief); ECF #17 (Madrigal's brief); ECF # 21 (Madrigal's reply brief).

[8] ECF #20-1 (Commissioner's charts); ECF #17-1 at 4-16 (Madrigal's charts).

[9] ECF #17-1 at 1-3 (Madrigal's fact sheet).

[10] ECF # 23.

[11] ECF # 17-1 at 1.

[12] *Id*.

[13] ECF #15, Transcript ("Tr.") at 73.

[14] *Id*. at 75.

[15] *Id*. at 59.

a history of polysubstance abuse (alcohol and marijuana) (20 CFR 416.920 (C)).[16] The ALJ

made the following finding regarding Madrigal's residual functional capacity:

> The claimant has the residual functional capacity to perform a full range of
> work at all exertional levels but with the following non-exertional limitations:
> she retains the ability perform simple, routine, repetitive tasks consistent with
> unskilled work in a static environment with few changes and no fast pace; can
> have superficial interactions with coworkers, supervisors, and the public;
> should not work in teams or tandem jobs; and can make simple work related
> decisions.[17]

> The claimant has no past relevant work.**[18]**

Based on an answer to a hypothetical question posed to the vocational expert at the

hearing setting forth the residual functional capacity finding quoted above, the ALJ

determined that a significant number of jobs existed locally and nationally that Madrigal

could perform.[19] The ALJ, therefore, found Madrigal  not under a disability.[20]

**B.     Issues on judicial review**

Madrigal asks for reversal of the Commissioner's decision on the ground that it does

not have the support of substantial evidence in the administrative record. Specifically,

Madrigal presents the following issues for judicial review:

---

[16] *Id.*

[17] *Id.* at 55.

[18] *Id*. at 59.

[19] *Id*. at 60.

[20] *Id*. at 61.

- Whether the ALJ blatantly violated governing law when she failed to analyze or even discuss whether Ms. Madrigal met or equaled listing 12.02C because the evidence demonstrates that she does indeed meet or equal this listing.[21]

- Whether the ALJ violated agency regulation and circuit law in attributing "little weight" to treating psychiatrist Dr. Arar's well supported medical expert opinion and relying on an outdated state agency opinion in formulating the RFC.[22]

- Whether the ALJ did not properly evaluate Ms. Madrigal's physical impairments, including her acknowledged obesity and its effects on her functional abilities in further violation of governing law.[23]

For the reasons that follow, I will recommend finding that:

1.  There was no error in the ALJ not directly addressing Listing 12.05 on this record;

2.  Substantial evidence does not support the weight assigned to the opinion of Madrigal's treating physician, nor the method by which his opinion was analyzed;

3.  Substantial evidence does not support the ALJ's failure to consider Madrigal's obesity in accordance with the regulations and the applicable case authority.

Accordingly, as will be set forth below, I will recommend that the matter be remanded for further proceedings consistent with this Report and Recommendation.

---

[21] ECF # 17 at 10.

[22] *Id*. at 15.

[23] *Id*. at 18.

-4-

# Analysis

**A.**     **Standards of review**

*1.*     *Substantial evidence*

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "

> The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[24]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner

---

[24] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

-5-

survives "a directed verdict" and wins.[25] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[26]

I will review the findings of the ALJ at issue here consistent with that deferential standard.

## 2.     *Treating physician rule and good reasons requirement*

The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[27]

If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight.[28]

---

[25] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06CV403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[26] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

[27] 20 C.F.R. § 416.927(d)(2). The companion regulation for disability insurance benefits applications is § 404.1527(d)(2). [Plaintiff's last name only] filed only an application for supplemental security income benefits.

[28] *Id.*

The ALJ has the ultimate responsibility for determining whether a claimant is disabled.[29] Conclusory statements by the treating source that the claimant is disabled are not entitled to deference under the regulation.[30]

The regulation does cover treating source opinions as to a claimant's exertional limitations and work-related capacity in light of those limitations.[31] Although the treating source's report need not contain all the supporting evidence to warrant the assignment of controlling weight to it,[32] nevertheless, it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" to receive such weight.[33] In deciding if such supporting evidence exists, the Court will review the administrative record as a whole and may rely on evidence not cited by the ALJ.[34]

In *Wilson v. Commissioner of Social Security*,[35] the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in

---

[29] *Schuler v. Comm'r of Soc. Sec.*, 109 F. App'x 97, 101 (6th Cir. 2004).

[30] *Id.*

[31] *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 991 (N.D. Ohio 2003), citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2nd Cir. 2003).

[32] *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).

[33] *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001).

[34] *Id.* at 535.

[35] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

the context of a disability determination.[36] The court noted that the regulation expressly contains a "good reasons" requirement.[37] The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.

- Identify evidence supporting such finding.

- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.[38]

The court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error.[39] It drew a distinction between a regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business.[40] The former confers a substantial, procedural right on the party invoking it that cannot be set aside for harmless error.[41] It concluded that the requirement in § 1527(d)(2) for articulation of good reasons for not giving controlling weight

---

[36] *Id.* at 544.

[37] *Id.*, citing and quoting 20 C.F.R. § 404.1527(d)(2).

[38] *Id.* at 546.

[39] *Id.*

[40] *Id.*

[41] *Id.*

to a treating physician's opinion created a substantial right exempt from the harmless error rule.[42]

The Sixth Circuit in *Gayheart v. Commissioner of Social Security*[43] recently emphasized that the regulations require two distinct analyses, applying two separate standards, in assessing the opinions of treating sources.[44] This does not represent a new interpretation of the treating physician rule. Rather it reinforces and underscores what that court had previously said in cases such as *Rogers v. Commissioner of Social Security*,[45] *Blakley v. Commissioner of Social Security*,[46] and *Hensley v. Astrue*.[47]

As explained in *Gayheart*, the ALJ must first consider if the treating source's opinion should receive controlling weight.[48] The opinion must receive controlling weight if (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the administrative record.[49] These factors are expressly set out in 20 C.F.R. § 416.927(d)(2). Only if the ALJ decides not to give the treating source's

---

[42] *Id.*

[43] *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013).

[44] *Id.* at 375-76.

[45] *Rogers*, 486 F.3d at 242.

[46] *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009).

[47] *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009).

[48] *Gayheart*, 710 F.3d at 376.

[49] *Id.*

-9-

opinion controlling weight will the analysis proceed to what weight the opinion should receive based on the factors set forth in 20 C.F.R. §§ 416.927(d)(2)(i)-(ii), (3)-(6).[50] The treating source's non-controlling status notwithstanding, "there remains a presumption, albeit a rebuttable one, that the treating physician is entitled to great deference."[51]

The court in *Gayheart* cautioned against collapsing these two distinct analyses into one.[52] The ALJ in *Gayheart* made no finding as to controlling weight and did not apply the standards for controlling weight set out in the regulation.[53] Rather, the ALJ merely assigned the opinion of the treating physician little weight and explained that finding by the secondary criteria set out in §§ 1527(d)(i)-(ii), (3)-(6) of the regulations,[54] specifically the frequency of the psychiatrist's treatment of the claimant and internal inconsistencies between the opinions and the treatment reports.[55] The court concluded that the ALJ failed to provide "good reasons" for not giving the treating source's opinion controlling weight.[56]

> But the ALJ did not provide "good reasons" for why Dr. Onady's opinions fail to meet either prong of this test.

---

[50] *Id.*

[51] *Rogers*, 486 F.3d at 242.

[52] *Gayheart*, 710 F.3d at 376.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

To be sure, the ALJ discusses the frequency and nature of Dr. Onady's treatment relationship with Gayheart, as well as alleged internal inconsistencies between the doctor's opinions and portions of her reports. But these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight.[57]

In a nutshell, the *Wilson/Gayheart* line of cases interpreting the Commissioner's regulations recognizes a rebuttable presumption that a treating source's opinion should receive controlling weight.[58] The ALJ must assign specific weight to the opinion of each treating source and, if the weight assigned is not controlling, then give good reasons for not giving those opinions controlling weight.[59] In articulating good reasons for assigning weight other than controlling, the ALJ must do more than state that the opinion of the treating physician disagrees with the opinion of a non-treating physician[60] or that objective medical evidence does not support that opinion.[61]

The failure of an ALJ to follow the procedural rules for assigning weight to the opinions of treating sources and the giving of good reason for the weight assigned denotes

---

[57] *Id.*

[58] *Rogers*, 486 F.3d 234 at 242.

[59] *Blakley*, 581 F.3d at 406-07.

[60] *Hensley*, 573 F.3d at 266-67.

[61] *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-52 (6th Cir. 2010).

a lack of substantial evidence even if the decision of the ALJ may be justified based on the record.[62] The Commissioner's *post hoc* arguments on judicial review are immaterial.[63]

Given the significant implications of a failure to properly articulate (*i.e.*, remand) mandated by the *Wilson* decision, an ALJ should structure the decision to remove any doubt as to the weight given the treating source's opinion and the reasons for assigning such weight. In a single paragraph the ALJ should state what weight he or she assigns to the treating source's opinion and then discuss the evidence of record supporting that assignment. Where the treating source's opinion does not receive controlling weight, the decision must justify the assignment given in light of the factors set out in §§ 1527(d)(1)-(6).

The Sixth Circuit has identified certain breaches of the *Wilson* rules as grounds for reversal and remand:

- the failure to mention and consider the opinion of a treating source,[64]

- the rejection or discounting of the weight of a treating source without assigning weight,[65]

- the failure to explain how the opinion of a source properly considered as a treating source is weighed (*i.e.*, treating v. examining),[66]

---

[62] *Blakley*, 581 F.3d at 407.

[63] *Wooten v. Astrue*, No. 1:09CV981, 2010 WL 184147, at *8 (N.D. Ohio Jan. 14, 2010).

[64] *Blakley*, 581 F.3d at 407-08.

[65] *Id.* at 408.

[66] *Id.*

-12-

- the elevation of the opinion of a nonexamining source over that of a treating source if the nonexamining source has not reviewed the opinion of the treating source,[67]

- the rejection of the opinion of a treating source because it conflicts with the opinion of another medical source without an explanation of the reason therefor,[68] and

- the rejection of the opinion of a treating source for inconsistency with other evidence in the record without an explanation of why "the treating physician's conclusion gets the short end of the stick."[69]

The Sixth Circuit in *Blakley*[70] expressed skepticism as to the Commissioner's argument that the error should be viewed as harmless since substantial evidence exists to support the ultimate finding.[71] Specifically, *Blakley* concluded that "even if we were to agree that substantial evidence supports the ALJ's weighing of each of these doctors' opinions, substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(d)(2) as harmless error."[72]

In *Cole v. Astrue*,[73] the Sixth Circuit reemphasized that harmless error sufficient to excuse the breach of the treating source rule only exists if the opinion it issues is so patently

---

[67] *Id.* at 409.

[68] *Hensley*, 573 F.3d at 266-67.

[69] *Friend*, 375 F. App'x at 551-52.

[70] *Blakley*, 581 F.3d 399.

[71] *Id.* at 409-10.

[72] *Id.* at 410.

[73] *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011).

-13-

deficient as to make it incredible, if the Commissioner implicitly adopts the source's opinion or makes findings consistent with it, or if the goal of the treating source regulation is satisfied despite non-compliance.[74]

### 3. *Meeting a listing at step three*

If a claimant has a severe impairment or combination of impairments that meets one of the listings in Appendix 1 to Subpart P of the regulations, the claimant is disabled.[75] Because the listings describe impairments that the Social Security Administration considers "severe enough to prevent and individual from doing any gainful activity, regardless of his or her age, education, or work experience,"[76] the Commissioner will deem a claimant who meets or equals the requirements of a listed impairment conclusively disabled.[77] Each listing sets out "the objective medical and other findings needed to satisfy the criteria of that listing,"[78] and the claimant bears the burden of proving[79] that he has satisfied all of he criteria of a listing in order to "meet the listing."[80]

---

[74] *Id.* at 940.

[75] *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Circ. 2009); *Cunningham v. Comm'r of Soc. Sec.*, No. 5:10CV1001, 2012 WL 1035873, at *2 (N.D. Ohio March 27, 2012) (citing Rabbers).

[76] 20 C.F.R. § 404.1525(a).

[77] *Rabbers*, 582 F.3d at 653.

[78] 20 C.F.R. § 404.1525(c)(3).

[79] *Rabbers*, 582 F.3d at 653.

[80] *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Even if a claimant cannot demonstrate disability by meeting the listing, he may be disabled if his impairment is the medical equivalent of a listing.[81]  Medical equivalent means that the impairment is "at least as equal in severity and duration to the criteria of any listed impairment."[82]  The claimant seeking a finding that an impairment is equivalent to a listing must present "medical findings" that show his impairment is "equal in severity to all the criteria for the one most similar listed impairment."[83]

While the Sixth Circuit "does not require a heightened articulation standard [from the ALJ] at Step Three of the sequential evaluation process,"[84] "in order to conduct a meaningful review, the ALJ must make it sufficiently clear in his or her decision the reasons for the determination [as to the meeting a listing] in order for the Court to conduct a meaningful review."[85]

Specifically, the Sixth Circuit in *Reynolds* states the requirements for articulating the ALJ's step three analysis as follows:

---

[81] 20 C.F.R. § 404.1520(a)(4)(iii).

[82] 20 C.F.R. § 404.1526(a).

[83] *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)(emphasis in original).

[84] *Marok v. Astrue*, No. 5:08CV1832, 2010 WL 2294056, at *3 (N.D. Ohio June 3, 2010) (citing *Bledsoe v. Barnhart,* No. 04-4531, 2006 WL 229795, at *411 (6th Cir. Jan. 31, 2006) (citing *Dorton v. Hecker*, 789 F.2d 363, 367 (6th Cir. 1986).

[85] *Eiland v. Astrue*, No. 1:10CV2436, 2012 WL 359677, at *9 (N.D. Ohio Feb.2, 2012) (citing *Marok*, 2010 WL 2294056. At *3 (citations omitted)).

In short, the ALJ need[s] to actually evaluate the evidence, compare it to the criteria of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without [such articulation], it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.[86]

Recent decisions in the District apply this rubric from *Reynolds* teach plainly that "a mere rote recitation if boilerplate language by an ALJ"[87] at step three provides an insufficient explanation for a conclusion regarding the meeting of a listing and so will require a remand.[88]

### 4.      *Standard of Review for Listing 12.05*

I extensively reviewed the applicable standard of review for Listing 12.05 in *Hobbs v. Commissioner of Social Security:*[89]

---

[86] *Reynolds*, 424 F.App'x at 415. In this regard, I note as Magistrate Judge Burke in *Shea v. Astrue*, No. 1:11CV1076, 2012 WL 967088, at *10 n. 6 (N.D. Ohio Feb. 13, 2012), that the Sixth Circuit's insistence on the articulation of reviewable reasons directly follows from the ALJ's statutory duties at 5 U.S.C. § 557 ( C )(3)(A) to include the "reasons or basis" for a decision.  Therefore, the Sixth Circuit has determined that the "reasons requirement" is both a procedural and substantive requirement, "necessary in order to facilitate effective and meaningful judicial review." *Shea*, 2012 WL 967088, at *10 n. 6 (quoting *Reynolds*, 424 F. App'x at 414).

[87] *Jones v. Comm'r of Soc. Sec.*, 5:10CV2621, 2012 WL 946997, at *8 (N.D. Ohio March 20, 2012)(Baughman, MJ).

[88] *Id.*; *Cunningham v. Comm'r of Soc. Sec.*, No. 5:10CV1001, 2012 WL 1035873, at *2 (N.D. Ohio March 27, 2012)(citations omitted)(Baughman, MJ); Shea, 2012 WL 967088, at *10 (citations omitted); *May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, at *9 (N.D. Ohio June 1, 2011)(White, MJ), adopted, 2011 WL 3490229 (N.D. Ohio Aug. 10, 2011)(Adams, J.); *Marok*, 2010 WL 2294056, at —4-5 (N.D. Ohio June 3, 2010)(Pearson, MJ).

[89] *Hobbs v. Comm'r of Soc. Sec.*, No.1:13CV1411, 2014 WL 4545921 (N.D. Ohio Sept. 12, 2014).

As the Sixth Circuit recently noted, because "satisfying the listing at the third step yields an automatic determination of disability based on medical findings, rather than judgment based on all relevant factors for an individual claimant, the evidentiary standards for a presumptive disability under the listings are more strenuous than for claims that proceed through the entire five step evaluation."[90]

With that in mind, Judge Gwin recently summarized the applicable standard for determining disability under Listing § 12.05C as follows:

> To be rendered disabled under Listing 12.05C, an individual must (1) have a valid IQ score between 60 and 70; (2) suffer from another impairment causing a significant work-related limitation of function; and (3) fit the "diagnostic description"[FN53] – that is, he must exhibit "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested ... before age 22."[FN54] With respect to the requirements of the diagnostic description, a claimant must satisfy three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; (3) and adaptive skills limitations."[FN55] "Adaptive skills limitations" refers to "a claimant's effectiveness in areas such as social skills, communications skills, and daily-living skills."[FN56]

FN53. *West v. Comm'r of Soc. Sec.,* 240 F. App'x 692, 697–98 (6th Cir. 2007). *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05; *Foster v. Halter,* 279 F.3d 348, 354-55.

FN54. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05. *See West,* 240 F. App'x at 697–98; *Foster,* 279 F.3d at 354-55.

FN55. *Hayes v. Comm'r of Soc. Sec.,* 357 F. App'x 672, 674–75 (6th Cir. 2009).

---

[90] *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citation omitted).

-17-

FN56. *Id.* at 677 (citing *Heller v. Doe,* 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)* (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 28–29 (3d rev.ed.1987).[91]

Moreover, Judge O'Malley has developed the analytical standard as to the first prong – the diagnostic description – in greater depth:

> With respect to the requirements of the introductory paragraph, "a claimant must demonstrate three factors to satisfy the diagnostic description: (1) subaverage intellectual functioning; (2) onset before age twenty-two; (3) and adaptive skills limitations."[FN9] *Hayes,* 2009 WL 4906909 at *2.* The requirements of the introductory paragraph track the definition of mental retardation in the *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition ("DSM–IV"), and the Sixth Circuit references the DSM–IV when evaluating disability claims. *Burrell v. Comm'r of Soc. Sec.,* No. 99–4070, 2000 U.S.App. LEXIS 33161, at *4 (6th Cir. Dec. 8, 2000) (citing Brown, 948 F.2d at 270).

> FN9. "Adaptive skills limitations" refers to "a claimant's effectiveness in areas such as social skills, communications skills, and daily-living skills." *Hayes,* 2009 WL 4906909 at *5* (citing *Heller v. Doe,* 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)* (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* 28–29 (3d rev. ed.1987)).

> If the claimant satisfies the diagnostic description of the introductory paragraph, then he must establish both components of sub-section ©: he must have (1) a valid IQ score below 71; and (2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See West v. Comm'r of Soc. Sec.,* 240 F. App'x 692, 697–98 (6th Cir. July 5, 2007) (unpublished).

> As the regulation indicates, the two components of sub-section C address the *severity* of the impairment: the Social Security Act recognizes that many individuals with mild mental retardation are still able to work and, accordingly, a claimant who satisfies the diagnostic description must still produce a valid IQ score below 71 *and* demonstrate "a physical or other mental

---

[91] *Holt v. Comm'r of Soc. Sec.*, No. 1:12CV2369, 2013 WL 4748029, at *3 (N.D. Ohio Sept. 4, 2013).

impairment imposing an additional and significant work-related limitation of function." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C); *see also Muntzert v. Astrue,* 502 F.Supp.2d 1148, 1157–58 (D.Kan.2007) ("DSM–IV and Listing 12.05(C) assume many, if not most, mildly mentally retarded individuals will be able to work. However, they recognize that some mildly mentally retarded individuals may be unable to work where they have 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.' 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).").[92]

Of particular importance here, *Thomas v. Commissioner of Social Security* also emphasizes that there is "ample Sixth Circuit precedent for the proposition that ... a clinical psychologist's diagnosis of the claimant as outside the definition of 'mental retardation' is an important factor for the ALJ to consider in determining whether the claimant satisfies the introductory paragraph of Listing 12.05C."[93] *Thomas* explained further:

> [S]ignificant reliance [by the ALJ] on a diagnosis of something other than 'mental retardation' such as 'borderline intellectual functioning,' is particularly sensible in light of the fact that the diagnostic description of mental retardation in the introductory paragraph of Listing 12.05 tracks the DSM-IV. Indeed, the DSM-IV is 'one of the leading texts in medicine and, as noted above, it is used extensively by Sixth Circuit courts to evaluate disability claims.[94]

Thus, *Thomas* concluded, while a diagnosis of mental retardation is not a requirement imposed by the introductory paragraph of Listing 12.05C, an ALJ is entitled to give

---

[92] *Thomas v. Comm'r of Soc. Sec.*, No. 08CV1365, 2010 WL 1254788, at *8 (N.D. Ohio March 25, 2010).

[93] *Id.*, at *11 (citations omitted).

[94] *Id.* (citations omitted).

"substantial weight" to the diagnosis of borderline intellectual functioning, not mental retardation, despite the presence in the record of a full-scale IQ score of 70.[95]

Similarly, and also by Judge O'Malley, is the case of *Brooks v. Astrue*,[96] decided just the day before *Thomas*. *Brooks* found, *inter alia*, that a diagnosis of something less severe than mental retardation in a situation where the claimant has an IQ score below 71 is "relevant evidence" as to both (a) whether the diagnostic description was met, and (b) whether the IQ score was valid.[97]

Moreover, in *Griffith v. Colvin*[98] Magistrate Judge White set forth in greater detail the requirements for meeting Listing 12.05 as to the criteria of deficits of adaptive functioning manifested before age 22:

> Based on the above, to satisfy Listing 12.05(C), a claimant must demonstrate: (1) subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and, (3) an additional and significant work related limitation or function. See e.g., *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). In this case, the decisive issue is whether substantial evidence supports the ALJ decision with respect to the first requirement.
>
> Listing 12.05 does not define the phrase "adaptive functioning." Other courts have noted, however, that another portion of the Listings offers examples of "adaptive activities," which include "cleaning, shopping, cooking, taking

---

[95] *Id.*, at *12.

[96] *Brooks v. Astrue*, No. 08CV2608, 2010 WL 1254323 (N.D. Ohio Mar. 24, 2010).

[97] *Id.*, at *6 (citations omitted).

[98] *Griffith v. Colvin*, No. 1:13CV2502, 2014 WL 5858337 (N.D. Ohio Nov. 12, 2014).

-20-

public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P. App. 1 § 12.00(C)(1); see e.g., *Wright v. Astrue*, 2013 U.S. Dist. LEXIS 26795 at – 31–32, 2013 WL 753823 (S.D. Ohio Feb.26, 2013). The Sixth Circuit has described deficits in adaptive functioning as follows:

> The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily living skills. *Heller v. Doe*, 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 28-29 (3d rev. ed. 1987) ("DSM-III")). To determine the definition of mental retardation under the SSA, it is appropriate to consult leading professional organizations' definitions. See 67 Fed.Reg. 20022 (2002). The American Psychiatric Association defines adaptive-skills limitations as "[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety." DSM-IV-TR at 49.

*Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 677 (6th Cir.2009); accord *Wright*, 2013 U.S. Dist. LEXIS 26795 at * * 31-32, 2013 WL 753823; *Greathouse v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 18904, 2014 WL 587374 (N.D. Ohio Feb.14, 2014).

A number of recent decisions from within this Circuit have pointed out that "[n]owhere in the paragraph [discussing the diagnostic description] is it specified how severe such limitations must be to qualify." *Gethin v. Colvin*, 2014 WL 4104130 at *10 (W.D.Ky. Aug.18, 2014); *Robinson v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 93783, 2014 WL 3419309 (S.D.Ohio July 10, 2014) ("The plain language of Listing 12.05 does not identify how severe limitations must be to qualify as 'deficits in adaptive functioning.' "). The *Gethin* and *Robinson* decisions indicate that case law from the Sixth Circuit and other federal courts suggest that a claimant must have "relatively significant deficits" to satisfy the Listing. *Id*. It seems unlikely that an individual with relatively low IQ scores, whether falling in the range of mental retardation or borderline intellectual functioning, would have absolutely no deficits in adaptive functioning. As such, this Court reasons that *significant*

deficits in adaptive functioning are required before the diagnostic criteria can be considered satisfied.[99]

**B.     Application of standards**

This matter presents both an articulation issue as to whether Madrigal met Listing 12.05[100] and an issue as to whether the ALJ properly analyzed the opinion Dr. Habeeb Arar, M.D., Madrigal's treating psychologist.[101]

*1.     Articulation as to Listing 12.05*

Madrigal argues that the ALJ erred as a matter of law when she failed to expressly analyze whether Madrigal met Listing 12.05, whether or not Madrigal actually met this Listing.[102] Madrigal maintains that she has:

(1) the requisite low IQ scores that satisfy the first criteria of the Listing;[103]

(2) other mental impairments, such as her PTSD, that impose additional and significant work-related limitations of function;[104] and

(3) deficits in adaptive functioning that manifested before the age of 22, such as her participation in special education classes from second grade through ninth grade.[105]

---

[99] *Id*. at *4.

[100] ECF # 17 at 1-2.

[101] *Id*. at 2.

[102] *Id*. at 10-11.

[103] *Id*. at 12.

[104] *Id*. at 12-13.

[105] *Id*. at 13-14.

With regard to the third element cited above - deficits in adaptive functioning - Madrigal asserts that even if the evidence of record does not support a finding that she met or equaled this criteria, "the ALJ had a duty to discuss the applicability of the Listing under these facts."[106]

Here, the ALJ considered whether the evidence showed that Madrigal met or medically equaled Listings 12.02, 12.04, 12.06 and 12.09, but not 12.05.   The ALJ found that Madrigal, *inter alia*, had the significant impairment of "borderline intellectual functioning,"[107] and not "mental retardation."[108]   That finding of borderline intellectual functioning was made in 2014 by Haley O'Connell, Psy. D., who conducted a consultative psychological examination in 2014.[109] Dr. O'Connell's 2014 diagnosis confirmed an earlier 2005 finding by James Spindler, M.S., which found that although Madrigal's IQ scores are in the mild range of mental retardation, she appears to function in the borderline range of intelligence.[110]

---

[106] *Id*. at 14-15 (citing *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411, 415-16 (6th Cir. 2011)).

[107] *Id*. at 52.

[108] The term "mental retardation" has been replaced by the phrase "intellectual disability" in Listing 12.05. 78 Fed. Reg. 46, 499 (Aug.1, 2013) (to be codified at 20 C.F.R. parts 404 and 416).  But, since the present record uses the prior term, I do so as well in the interest of readability and consistency.

[109] Tr. at 57 (citing record).

[110] *Id*. at 56.

Thus, as noted above, while a specific diagnosis of mental retardation is not required by Listing 12.05, a diagnosis by a clinical psychologist that the claimant is functioning at a higher level than "mental retardation," even while the IQ tests are below 71, is an important factor for determining that the claimant cannot meet even the requirements of the introductory paragraph of Listing 12.05C.[111]    Moreover, although the ALJ did not specifically mention Listing 12.05, the opinion of Bruce Goldsmith, Ph.D. a state agency reviewing psychologist, to which the ALJ gave significant weight,[112] did consider Listing 12.05, and found the Listing was not met.[113]

Accordingly, insofar as Madrigal claims that it was legal error not to specifically articulate the reasons why she did not meet Listing 12.05 on the basis of her low IQ scores, the mere existence of low IQ scores no longer triggers a requirement that an ALJ must analyze Listing 12.05.[114]   Rather an ALJ must consider Listing 12.05 only where the record raises a "substantial question" of whether the claimant could qualify as disabled under that listing.[115]

---

[111] *Brooks*, 2010 WL 1254323 at * 6.

[112] Tr. at 58.

[113] *Id.* at 117-18.

[114] *Hobbs*, 2014 WL 4545921, at * 4 (citation omitted).

[115] *Id.* (citation omitted).

-24-

As the Sixth Circuit observed in *Sheeks v. Commissioner of Social Security*[116] in circumstances very close to the present case:

> Sheeks makes only a tenuous case for meeting a listing 12.05(C).  Take his evidence in support of the listings third requirement: onset before age twenty-two.  As to "significantly subaverage general intellectual functioning."  Sheeks points only to his special education classes and his failure to finish high school.  Sheeks testified that he attended special education classes "in elementary school" because he "couldn't see [and] couldn't pay attention" as a child.  AR at 45.  Yet Sheeks did not attend special education classes in high school.  And while he did leave high school in the eleventh grade, he eventually earned a GED.  As to "deficits in adaptive functioning."  Sheeks does not flag any record evidence suggesting he had trouble caring for himself or handling social situations before age twenty-two.  See *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir.2007) (suggesting that adaptive functioning refers to the "claimant's effectiveness in areas such as social skills, communication, and daily living skills").  A substantial question about whether a claimant meets a listing requires more than what Sheeks has put forth here, a mere toehold in the record on an essential element of the listing.   The ALJ this did not commit reversible error in failing to discuss the listing.[117]

Here, as in *Sheeks*, Madrigal places significant emphasis on her participation in special education classes as constituting "evidence of deficits in adaptive functioning under 12.05C."[118]  But, as *Sheeks* makes clear, her presence in such classes does not of itself raise such a substantial question as to whether she meets Listing 12.05 as to require the ALJ to specifically analyze that Listing.  Further, as the ALJ extensively discussed, Madrigal's own testimony at the consultative psychological examination disclosed only mild restrictions in

---

[116] *Sheeks v. Comm'r of Soc. Sec.*,544 Fed. App'x 639 (6th Cir. 2013).

[117] *Id.* at 642.

[118] ECF # 17 at 13.

activities of daily living, and moderate difficulties in social functioning.[119]As such, there was also no evidence of a "red flag" in these areas as would alert the ALJ to the existence of a substantial question as to whether Madrigal met Listing 12.05.[120]

## 2. *Treating physician-Dr. Arar*

In this case, Madrigal was treated during the period 2012-2013  by psychiatrist Dr. Habeeb Arar. M.D.[121]  On March 13, 2013 Dr. Habeed, who diagnosed Madrigal with major depressive disorder,[122] supplied a functional opinion as to Madrigal's limitations in numerous categories.[123]  The ALJ noted this opinion, and briefly summarized some of its conclusions, but did not identify Dr. Arar as a treating source.[124]  He then assigned his opinion only little weight because it is not supported by Dr. Arar's clinical findings.[125]  The ALJ further noted that it was done as a "check box" form, and that Dr. Arar "does not support his conclusions with evidence from the objective record."[126]

---

[119] Tr. at 53-54.

[120] *See, Sheeks*, 544 Fed. App'x at 642.

[121] Tr. at 369, 401, 405, 408, 428 and 490.

[122] *Id.* at 428.

[123] *Id.* at 428-30.

[124] *Id.* at 58.

[125] *Id.*

[126] *Id.*

By contrast, Madrigal points to the significant weight given to the 2012 functional opinion of state reviewing psychologist, Dr. Bruce Goldsmith, Ph.D.[127]    Madrigal then argues that the ALJ "virtually adopted" the mental RFC set forth by Dr. Goldsmith in 2012 while "making virtually no allowance for any of the greater functional deficits" noted by her treating psychiatrist or in 2014 by the state agency consulting psychologist.[128]

As to state agency psychologist, Dr. Haley O'Connell, Ph.D., her 2014 examination and opinion was noted by the ALJ, who extensive discussed the examination findings and gave the opinion some weight.[129]  The ALJ concluded that Dr. O'Connell's opinion was consistent with the RFC's provisions as to simple, routine and repetitive work, and found mild limitations as to Madrigal's ability to maintain social function,[130] which area was also addressed in the RFC.[131]

In first addressing Dr. Arar, the treating psychiatrist, the ALJ here has not even attempted to undertake the two-step analysis prescribed by *Gayheart*, beginning with the failure to acknowledge Dr. Arar as a treating source, and so there is no indication that his opinion was analyzed any differently from that given by other sources. While the Sixth Circuit has allowed a fairly wide "strike zone" to ALJ's in this regard, the failure to carefully

---

[127] ECF # 17 at 16.

[128] *Id.*

[129] Tr. at 57-58.

[130] *See, id.* at 561.

[131] *Id.* at 58.

follow the analytical framework set out in *Gayheart* at least raises the level of difficulty for the reviewing court in seeking to determine if a claimant has been accorded the process due under the regulations.

More specifically, even if the sole test were simply whether the ALJ stated good reasons for discounting the opinion of Dr. Arar, I note that the reasons given here are conclusory, unspecific and vague.

As to the ALJ's stated reason that Dr. Arar's conclusions are not supported by his clinical findings, the record shows that Dr. Arar was part of Unison Behavioral Health Group, where Madrigal was treated from 2012-14 after being referred there by her parole officer.[132] These extensive treatment notes, some of which are directly signed by Dr. Arar while others are not, are not easy to summarize here. More importantly, by dismissing Dr. Arar's opinions as simply not supported by the general record, the reviewing court is unable to determine precisely what portions of this extensive treatment record the ALJ found to be incompatible with Dr. Arar's opinion.

Further, by stating that Dr. Arar's opinion should be given lesser weight simply because it was tendered on check-box form is also disingenuous. First, the 2012 opinion of Dr. Goldsmith to which the ALJ gave significant weight is functionally identical to a check box form used by Dr. Arar, differing only in that Dr. Goldsmith gave answers of just a few words, rather than checking a box as to multiple choice answers, in response to a series of

---

[132] *Id.* at 347-78; 401-27; 431-505; 528-47; 580-621.

questions, with neither source providing any immediate link to the evidence supporting that answer.

Further, as discussed by the Ninth Circuit in *Garrison v. Colvin,[133]* one of the most "egregious and important errors" in analyzing the opinion of a treating source is to devalue the opinion of a treating source on the basis of the form in which that opinion was given.[134] Devaluing a treating source opinion on the grounds that it was given as checked answers in response to questions in a form rather than as a narrative discourse fails to recognize that in the ultimate sense the opinion was formed by a treating source, which deserves to be analyzed as such, and deflects attention from the real issue, as stated in the regulations, of whether the opinion is well-supported by the clinical evidence and not inconsistent with the other evidence of record.[135]  Moreover, the Sixth Circuit has long-held that a treating source opinion need not contain within itself all the evidence supporting that opinion in order to be entitled to controlling weight.[136]

Finally, in addition to the deficiencies noted above as to the direct treatment of Dr. Arar's opinion, a treating source opinion was downgraded in favor of a functional opinion from source who only reviewed the records, and who did so prior to Dr. Arar offering his

---

[133] *Garrison v. Colvin*, 759 F.3d 995 (9th Cir. 2014)

[134] *Id.* at 995.

[135] *See, id.* at 1013.

[136] *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).

opinion. In light of those circumstances, the ALJ here needed to more specifically articulate the reasons for such an outcome.

Thus, for the reasons stated,  substantial evidence does not support the ALJ's treatment of Dr. Arar's opinion, nor of the relatively greater weight given to the opinion of Dr. Goldsmith. Accordingly, I would recommend that the matter be remanded for further consideration.[137]

### 3.    *Physical impairments/obesity*

The final issue raised by Madrigal is that the ALJ did not properly evaluate the functional limitations imposed by her obesity and lumbar spine condition.[138] She argues that although the ALJ acknowledged her obesity, she never specifically assessed how that condition would manifest itself in terms of any functional limitations.[139] Moreover, she contends that the ALJ erred in finding that her lumbar spine condition produced no functional limitations, relying for that conclusion on the opinion of a state agency reviewing physician and rejecting the opinion of a state agency examining physician, who found that Madrigal was limited to less than the medium exertional level.[140]

---

[137] If on remand the ALJ assigns greater weight to Dr. Arar's opinion, it may require reconsideration of, and more articulation with respect to the finding at Step 3 under Listing 12.05.

[138] ECF # 17 at 18-19.

[139] *Id.* at 19.

[140] *Id.*

-30-

The Commissioner responds by stating that the regulation regarding obesity do not specify a particular mode of analysis, or standard of articulation, but rather require that obesity be considered insofar as it may contribute to the severity of other limitations.[141] Further, the Commissioner maintains that because the objective medical findings were normal, and because the state consultative examiner and state reviewing physician "factored" Madrigal's obesity into their RFC analysis, the ALJ satisfied any requirement to deal with Madrigal's obesity by giving great weight to the opinion of Dr. Abraham Mikalov, M.D. the state agency reviewer, who found no physical limitations.[142]

*Coldiron v. Commissioner of Social Security* sets out the relevant law regarding how an ALJ must address obesity:

> Social Security Ruling 02–1p explains the Administration's policy on the evaluation of obesity. Although the Administration no longer qualifies obesity as a "listed impairment," the ruling "remind[s] adjudicators to consider its effects when evaluating disability." SSR-02–1p, 2000 WL 928049, at *1 (S.S.A.). SSR-02–1p states:
>
>> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time . . . [O]ur RFC assessments must consider an individuals' maximum remaining ability to do sustained work activities in an ordinary work setting ona [sic] regular and continuing basis. A "regular and continuing basis"

---

[141] ECF # 20 at 17.

[142] *Id*. at 17-18 (citing *Coldiron v. Comm'r of Soc. Sec*., 391 F. App'x. 435, 443 (6th Cir. 2010)).

-31-

means 8 hours a day, for 5 days a week, or an equivalent work schedule.[143]

Id. at *6.

Contrary to Coldiron's argument, the Sixth Circuit declared it "a mischaracterization to suggest that Social Security Ruling 02–1p offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 412 (6th Cir. 2006). Instead, SSR 02–1p provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id*. at 412.

The record here shows that the ALJ sufficiently accounted for the effect that obesity has on Coldiron's ability to do sedentary work. The ALJ discussed obesity multiple times throughout his findings of fact, determining that Coldiron "appeared to be limited primarily by obesity and deconditioning," and finding that, at 5'11" and 403 pounds, Coldiron qualified as morbidly obese. He also concluded that Coldiron's obesity constituted a "severe impairment" and acknowledged that obesity contributed to Coldiron's other medical conditions. He noted, for instance, that Coldiron's weight exacerbated his mild restrictive lung defect, dyspnea, obstructive sleep apnea, and the musuloskeletal symptoms related to Coldiron's knee and back.

Further, when assigning Coldiron an RFC, the ALJ considered RFCs from physicians who explicitly accounted for Coldiron's obesity. State agency physician Dr. Klyop noted Coldiron's "extreme range of obesity" in opining that he could perform light work. State agency physician Dr. Norris noted that Coldiron's morbid obesity exacerbated his other conditions. Dr. Bailey discussed Coldiron's morbid obesity throughout her findings and Dr. Evans recorded Coldiron's weight at 335 pounds. Dr. Zancan, who performed Coldiron's shoulder surgery, also noted Coldiron's obesity. Every medical opinion that the ALJ evaluated acknowledged Coldiron's obesity. Thus, by utilizing the opinions of these physicians in fashioning Coldiron's RFC, the ALJ incorporated the effect that obesity has on the claimant's ability to work into the RFC he constructed. See *Bledsoe*, 165 Fed. Appx. At 412 (noting that an ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.2004) (stating "although the ALJ did not explicitly consider

---

[143] *Colidiron*, 391 F. App'x at 442-43.

[claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.").

Given the ALJ's discussion of Coldiron's obesity throughout his findings of fact and the ALJ's use of RFCs from physicians who explicitly considered Coldiron's obesity, we find that the ALJ adequately accounted for the effect that obesity has on Coldiron's ability to perform sedentary work.

That said, a decision by Magistrate Judge Armstrong in *Riley v. Astrue* emphasizes that in order for an ALJ to "consider" a claimant's obesity by means of reliance on a medical report that itself considered obesity, the relied-upon medical report must itself explicitly refer to the claimant's obesity, or to factors such as the claimant's height,, weight and BMI.[144] Here, although the ALJ noted among other non-severe impairments that Madrigal had been diagnosed as obese, and that her height and weight at the time of the hearing was 5'5" and 330 pounds,[145] Dr. Mikalov's 2012 functional capacity report, to which the ALJ assigned great weight, made no mention at all of any diagnosis of obesity, and merely mentioned Madrigal's weight and blood pressure, without also noting her height or BMI.[146]

As such, and following the guidance of *Riley*, the medical report relied on here insufficiently addressed Madigral's obesity. Given that the ALJ was clearly aware of Madrigal's obesity, and documented in the opinion her extreme weight relative to her height, she cannot be said to have adequately discussed the effect of Madrigal's obesity by relying

---

[144] *Riley v. Astrue*, No.5:11CV1587, 2012 WL 2367546, at * 16 (N.D. Ohio June 21, 2012).

[145] Tr. at 52.

[146] *Id*. at 116.

on a single opinion that never referred to that diagnosis and made a brief, attenuated and non-focused reference solely to Madrigal's weight.  That the ALJ had already expressly noted the diagnosis of obesity makes it imperative that there be some discussion of the severity of that condition and of its effect on Madrigal's functional limitations.[147]

By contrast, Dr. William Padamadan, M.D., a state examining physician, did specifically find that Madrigal was obese at five feet, five inches tall and 254 pounds.[148]  He also found that she complained of lower back pain "without objective findings and functional impairment."[149]  But the ALJ chose to give only little weight to Dr. Padamadan's opinion.[150]

Thus, insofar as the Commissioner is seeking to establish that the ALJ addressed Madrigal's obesity by referring to an analysis done by a medical source opinion that itself expressly considered obesity, only Dr. Mikalov's opinion can here be considered since it alone was actually relied upon to a significant degree by the ALJ. In that regard, *Coldiron* dealt with a situation where the ALJ "utiliz[ed]" the opinions of physicians who evaluated the claimant's obesity by "incorporating" the recognized effects of obesity articulated in those opinions into the final RFC.[151]   Here, it would be inapposite to the ruling in *Coldiron*

---

[147] *See, Stevens v. Commissioner*, 2013 WL 1399178, at * 14 (N.D. Ohio April 5, 2013).

[148] Tr. at 382.

[149] *Id.*

[150] *Id.* at 58.

[151] *Coldiron*, 391 F. App'x at 443.

-34-

to credit the ALJ with adequately considering Madrigal's obesity by locating that consideration in a medial report the ALJ dismissed as having little weight because it was "not consistent with the overall evidence of record...."

## Conclusion

For the foregoing reasons, I recommend that there was no error in the ALJ not directly addressing Listing 12.05 on this record, but that substantial evidence does not support the decision of the Commissioner as to the treatment of Dr. Arar's opinion and the analysis of Madrigal's obesity as concerns its severity, its relation to other impairments and its effects upon her functional capacity.

Accordingly, I recommend that the decision of the Commissioner in this regard is not supported by substantial evidence, and so should be remanded for further proceedings consistent with this Report and Recommendation.

Dated: December 28, 2016     s/ William H. Baughman, Jr.
             United States Magistrate Judge

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.[152]

---

[152] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).